UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| TERESA A. MANNING, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 16-11895-DPW |
| v. | ) | |
| | ) | |
| ABINGTON ROCKLAND JOINT | ) | |
| WATER WORKS, | ) | |
| | ) | |
| Defendant. | ) | |


MEMORANDUM AND ORDER
March 4, 2019

The plaintiff, Teresa Manning, brings this action against her former employer, Abington Rockland Joint Water Works, claiming the Water Works failed to provide her reasonable accommodations for her disabilities and chose instead to terminate her employment because of those disabilities.

The Water Works has moved for summary judgment both because Ms. Manning failed to exhaust her administrative remedies and because she cannot establish that the Water Works failed reasonably to accommodate her disabilities. I will grant the Water Works' motion for summary judgment.

# I. BACKGROUND

## A. *Factual Background[1]*

Ms. Manning began working at the Water Works in 1999 as an office clerk. She was terminated from her employment with the Water Works on August 26, 2014. During the course of her employment with the Water Works, Ms. Manning reported to the same two supervisors: Dan Callahan, the Superintendent, and Mr. Callahan's assistant, JoAnne Hall.

Office clerks perform a variety of tasks, many of which require the clerk to be present in the office on a daily basis. Their responsibilities are specialized and include billing individual customer accounts, answering phone calls, resolving customer concerns, receiving payments at the office window, scheduling service calls. It is unlikely that any temporary

---

[1] The Water Works filed its statement of undisputed material facts with its motion for summary judgment and Ms. Manning failed to respond to that statement in any way. More fundamentally, she failed to file her own statement of undisputed material facts. Therefore, all facts referenced here are taken from the Water Works statement. *See generally* Local Rule 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."); *Cochran* v. *Quest Software*, *Inc.*, 328 F.3d 1, 12 (1st Cir. 2003) (deeming admitted the uncontroverted facts submitted by the moving party pursuant to Local Rule 56.1); *Stonkus* v. *City of Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003) ("Because Stonkus did not controvert the statement of undisputed material facts that the defendants filed with their summary judgment motion, we deem those facts admitted . . . .")

replacement employee without prior work experience at the Water Works or a similar entity would be able to perform these duties effectively unless that employee had weeks or months of on the job training.

For most of Ms. Manning's employment with the Water Works, she had a good attendance record.  In fact, Ms. Manning took no sick leave during the 2013 fiscal year, and she was therefore given additional personal days for the 2014 fiscal year.  But Mr. Callahan and Ms. Hall had longstanding concerns about Ms. Manning's work performance, including frequent mistakes, and her tendency to respond to criticism of her work performance with a contentious attitude.

Ms. Manning's alleged disabilities, a heart condition and a proclivity to panic attacks, surfaced in 2013.  Her heart condition resolved quickly and has not reappeared since.  The heart condition consisted of a single hospitalization with viral congestive heart failure on September 8, 2013.  Ms. Manning took a paid medical leave of absence from September 9, 2013 until October 8, 2013.  The Water Works did not object to Ms. Manning's leave of absence, and it accommodated her follow up medical appointments.

According to Ms. Manning, her proclivity to panic attacks became a disability in October 2013 and ended when her employment was terminated.  The first instance of this type of

disability occurred on October 23, 2013, the day after she had an argument with Mr. Callahan about taking work papers home. During that argument, Mr. Callahan told Ms. Manning that the Water Works policy did not allow documents to leave the office, and Ms. Manning became upset. She had taken Water Works documents home many times before this incident, including prior to the 2013 fiscal year.

On October 23, 2013, Ms. Manning experienced chest pain at work and left the office early to go to the hospital. Ms. Manning emailed her supervisors that she was not well; at the hospital she was diagnosed as likely having had stress-induced pain and discomfort. After this episode, Ms. Manning did not return to work until November 18, 2013, providing the Water Works with notes and documentation from her doctors that verified her condition. Ms. Manning was paid her full salary during this leave of absence.

In early November 2013, before she returned to work, Ms. Manning called Richard Muncey, one of the members of the Water Works Board of Commissioners ("the Board"), and she told him about her argument with Mr. Callahan on October 22. Ms. Manning told Mr. Muncey that she had been mistreated, and Mr. Muncey told Ms. Manning to bring her concerns before the Board.

On November 6, 2013, Ms. Manning and her attorney appeared before the Board, and Ms. Manning explained the circumstances

surrounding the October 22 incident and complained that she had been mistreated. Ms. Manning told the Board that she was on medical leave and would soon return to work, but she did not say that she had any disabilities or that she was seeking an accommodation. The Board did not take action against Mr. Callahan.

On December 12, 2013, Mr. Callahan and Ms. Hall met with Ms. Manning to discuss her uncooperative attitude and the strain it was placing on the work environment. Thereafter, Mr. Callahan felt that Ms. Manning continued to make careless mistakes and exhibit an uncooperative attitude. In January 2014, he informed the Board that he wanted to terminate Ms. Manning's employment. The Board held a hearing in late January or early February of 2014 at which Ms. Manning, accompanied by her attorney, testified and presented supporting witnesses. Although Ms. Manning complained of unfair treatment by Mr. Callahan, she did not discuss her alleged disabilities and did not request any accommodations. The Board chose not to support Ms. Manning's discharge.

In February 2014, after the hearing, Ms. Hall sent Ms. Manning an email telling her that they should communicate with each other on work-related matters solely in writing. Ms. Hall instituted this policy in order to help prevent disputes. Over the next month, Ms. Manning continued to make mistakes at work,

and Ms. Hall sent Mr. Callahan an email on March 5, 2014 that documented those mistakes.

On March 7, 2014, Ms. Manning took a medical leave of absence.  Ms. Manning's psychologist, Dr. Vicki Beggs, PhD, prepared a note on March 11, 2014 that indicated Ms. Manning was being treated for depression and was unable to work.  This was the first point at which Mr. Callahan was aware that Ms. Manning suffered from depression.  The note did not indicate when Ms. Manning would return to work.  Ms. Manning's leave was left open-ended.  The leave of absence presented difficulties for the Water Works because of its open-ended nature.  The Water Works fell behind on its work.

On April 4, 2014, Mr. Callahan sent Ms. Manning a letter enquiring when she would be returning to work.  Ms. Manning's psychologist, Dr. Beggs, sent back a note that Ms. Manning would be reevaluated in May for a possible return to work.  Then, on May 8, Dr. Beggs prepared a note indicating that Ms. Manning would be able to return to work on May 19, which she did.  For the duration of her leave, Ms. Manning was paid her full salary.

After Ms. Manning returned on May 19, she took 15 days of vacation and three personal days between May 21 and August 8. This was time that Ms. Manning was entitled to under her

employment contract.[2]  Nevertheless, the time off put additional pressure on the other office staff and caused the Water Works to continue to fall behind.  Even so, Mr. Callahan and Ms. Hall did not oppose or reject any of Ms. Manning's requests for time off.

In July, Ms. Hall notified Ms. Manning of a number of errors she had made that needed to be corrected.  Ms. Hall also notified Mr. Callahan of these mistakes and her frustration. For his part, Mr. Callahan exchanged emails with Ms. Manning, seeking an explanation for the mistakes.  Mr. Callahan informed Ms. Manning that he found her mistakes, her excuses, and her defensive responses troubling.

On August 4, 2014, Ms. Manning began a week-long vacation, which was followed immediately by an open-ended medical leave of absence.  On August 7, Dr. Beggs prepared a note indicating that Ms. Manning was being treated for depression and anxiety and that she was unable to work.  The note indicated that Ms. Manning would be reevaluated on August 29.  This was the first time Mr. Callahan learned that Ms. Manning was being treated for anxiety.  Ms. Manning sent Mr. Callahan an email informing him of her medical leave of absence on August 10.

---

[2]  I note that neither party has submitted the employment contract for the summary judgment record.  However, there is apparently no dispute between the parties regarding the right of Ms. Manning to take all of this amount of leave.

Finally, on August 26, 2014, Mr. Callahan sent Ms. Manning a letter terminating her employment on the basis of her inability to perform the job duties of an office clerk and excessive absenteeism.  By this time, Ms. Manning had not been present at work for 81 out of the 124 work days in her last six months of employment, and she was not present for 129 of 249 total work days during her last 12 months of employment.  Of the 129 days missed, 98.5 of the days were due to medical leave. Manning never requested an accommodation for her disabilities from the Water Works except to the degree her medical leave requests may be construed to be accommodation requests.

**B.**    *Procedural Background*

On May 21, 2015, Ms. Manning filed a Complaint with the Equal Employment Opportunity Commission ("EEOC").  The Complaint did not mention that the Water Works failed to accommodate her disabilities, nor does it address the contention that Ms. Manning took work papers home in an attempt to accommodate her disabilities.  In fact, Ms. Manning alleged that she took work papers home over the course of her time with the Water Works — long before either of her stated disabilities manifested themselves.

The EEOC issued Ms. Manning a notice of right to sue on June 28, 2015.

On September 16, 2016, Ms. Manning filed the three-count Complaint in this case alleging wrongful termination, sexual harassment and sex discrimination, and a violation of the Americans with Disabilities Act ("ADA").

On October 25, 2016, the Water Works filed a motion to dismiss the Complaint in its entirety. I granted the motion to dismiss except as to Count III, Ms. Manning's ADA claim alleging failure to accommodate her disabilities. Following the completion of discovery, the Water Works filed the motion for summary judgment now before me regarding the sole remaining claim.

## II. MOTION FOR SUMMARY JUDGMENT

### A. *Standard of Review*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if it "could be resolved in favor of either party" and a fact is material if it "has the potential of affecting the outcome of the case." *Calero-Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). I view the facts in the light most favorable to the nonmovant, drawing "all justifiable inferences" in her favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The moving party bears the burden of showing that 'there is an absence of

evidence to support the non-moving party's case.'" *Worlds* v. *Thermal Indus., Inc.*, 928 F. Supp. 115, 118 (D. Mass. 1996) (quoting *FDIC* v. *Municipality of Ponce*, 904 F.2d 740, 742 (1st Cir. 1990)). If the moving party meets its burden, "the burden then shifts to the non-moving party to establish affirmatively the existence of a genuine material issue of fact." *Id.* The nonmovant need only establish evidence that is "cognizable and sufficiently strong to support a verdict in her favor" in order to survive summary judgment. *Calero-Cerezo*, 355 F.3d at 19.

**B.  *Analysis***

The Water Works moves for summary judgment on Ms. Manning's claim for failure to accommodate under the ADA, on grounds that Ms. Manning failed to exhaust her administrative remedies. Alternatively, the Water Works contends that it is entitled to summary judgment because Ms. Manning could not perform the essential functions of her job and that she had requested no accommodation aside from medical leave, which the Water Works granted liberally.

### 1.  Exhaustion of Administrative Remedies

The Water Works argues that Ms. Manning failed to exhaust her administrative remedies with respect to her failure to accommodate claim because she made no such claim in her EEOC Charge. Although the Water Works is correct that Ms. Manning's EEOC Complaint did not focus on a failure to accommodate claim,

I conclude that the EEOC submission was sufficient to establish that Ms. Manning exhausted her administrative remedies with regard to that claim.

The ADA "mandates compliance with the administrative procedures specified in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and . . . such compliance must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA." *Bonilla* v. *Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 277 (1st Cir. 1999). Thus, a plaintiff seeking to recover under Title I of the ADA "first must exhaust administrative remedies by filing a charge with the EEOC . . . within the prescribed time limits." *Id.* at 278. While the requirement "is not jurisdictional," *id.* (citing *Zipes* v. *Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)), failure to comply with the requirement does "bar[] the courthouse door" to plaintiffs. *Id.*

As a general proposition, the purpose of the exhaustion "requirement is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation." *Lattimore* v. *Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996). Thus, the "purpose would be frustrated if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." *Id.* Accordingly, "[t]he scope of the civil complaint

is . . . limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." *Id.* (quoting *Powers* v. *Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990)) (internal quotation marks omitted).

However, "[a]n administrative charge is not a blueprint for the litigation to follow." *Powers* v. *Grinnell Corp.*, 915 F.2d 34, 38-39 (1st Cir. 1990) (citation omitted).  It is not clear whether Ms. Manning was represented by counsel when her EEOC complaint was filed.  In any event, even though an administrative charge filed by a *pro se* employee should be "liberally construed in order to afford the complainant the benefit of any reasonable doubt . . . *pro se* status does not relieve an employee of the obligation to meet procedural requirements established by law." *Lattimore*, 99 F.3d at 464 (citations omitted).  Under this protocol, "an employee is not required to comprehensively set forth with 'literary exactitude' all of the facts and theories upon which his or her claim is based," but she must "describe the essential nature of the claim and . . . identify the core facts on which it rests." *Id.* (citations omitted).

Ms. Manning's EEOC Complaint, supported by the boxes that she checked, can be grouped into two general allegations — retaliation and discrimination.

With regard to retaliation, the Complaint outlines the following: in 2008, she was subjected to sexually harassing emails from her supervisor, Mr. Callahan, and — after she reported him to the Board — she was retaliated against. Specifically, she was "subjected to ridicule" and called a "scumbag" and a "liar." Moreover, Ms. Manning alleged that in 2013 Mr. Callahan berated her in the parking lot as she was leaving work because she was taking paperwork home, a practice that she had engaged in previously without issue. Ms. Manning alleged that Mr. Callahan even blocked her car so she could not leave and that she reported "these and other incidents to the Board." Ms. Manning alleged that she was retaliated against because of her complaints concerning discrimination and harassment.

With regard to discrimination, Ms. Manning's EEOC Complaint includes the following: because of Mr. Callahan's behavior, she "developed" her "disability/disabilities, and began taking time off related to [her] conditions." Ms. Manning alleges that the Water Works "was aware as to why [she] was out of work, as [she] had provided many doctors' notes to document [her] absences and need for leave due to medical issues." In addition, she notes that she received her termination letter while she was on medical leave, and she was told that she was terminated in part because of her "consistent absenteeism."

Ms. Manning states that the Water Works "was fully aware that the absences were due to [her] medical conditions." She goes on to state that, despite the fact that she gave the Water Works doctors' notes that "substantiate[d] the absences, they chose to hold those absences for medical reasons against [her]." Ms. Manning makes clear that she had no issues with "absenteeism" until her "disabilities began." Finally, Ms. Manning alleges that she was discriminated against because of her disabilities and her disability-related absences were held against her and used as a reason to terminate her.

The Water Works' contention that Ms. Manning failed to exhaust her administrative remedies hinges on the precise language in Ms. Manning's EEOC Complaint, the EEOC's decision dismissing her charges, and some authority that frames the way in which courts consider the question of exhaustion with regard to administrative charges.

First, the Water Works argues that Ms. Manning's charges do not reference a failure to accommodate, and that, in fact, they indicate that Ms. Manning "believed she had been accommodated through [her] disability-related absences."[3] In addition, the

---

[3] This appears to be a distortion of Ms. Manning's EEOC Complaint. The fact that she took time off from work because of her medical issues, as to which her supervisor was aware, but then had her "disability-related absences . . . held against" her cannot fairly be said to constitute an admission that she was reasonably accommodated.

14

Water Works contends that Ms. Manning's "focus" was not on a failure to accommodate.

Second, the Water Works relies on the EEOC's decision dismissing the charges because the decision only discusses its investigation of disability discrimination.[4]

Third, the Water Works references a case, *Lara* v. *Unified Sch. Dist. 501*, No. 06-4145-RDR, 2008 WL 58870 (D. Kan. Jan. 3, 2008), said to "closely mirror" the facts of this case.

Under the ADA there are two forms of disability discrimination. The first is a violation of a traditional mandate that an employer shall not discriminate against a qualified individual with a disability because of the disability. *See Higgins* v. *New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 263-64 (1st Cir. 1999). Secondly, ADA law provides that prohibited discrimination can involve "not making

---

[4]  The EEOC's decision not to pursue Ms. Manning's Complaint characterized her charge as one of "employment discrimination including retaliation . . . because of [her] disability."  The EEOC discussed the evidence showing that Ms. Manning was terminated by the Water Works for legitimate, non-discriminatory reasons.  The EEOC's decision also included the statement that "[n]o finding is made as to any other issue that might be construed as having been raised by this charge."  The EEOC was clearly aware and acknowledged that there might have been other charges raised within Ms. Manning's Complaint as to which it failed to make findings.  Thus, the Water Works contention that her EEOC Complaint was not focused on a failure to accommodate, or that Ms. Manning's Complaint should be limited by the EEOC's discussion, is unconvincing.

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the accommodation would pose an "undue hardship" to the employer. *Id.* at 264 (quoting 42 U.S.C. § 12112(b)(5)(A)). Thus, courts distinguish between disability discrimination claims and failure to accommodate claims, with each claim requiring different elements to be met. *See, e.g.*, *Tobin* v. *Liberty Mut. Ins. Co.*, 433 F.3d 100, 102 (1st Cir. 2005) (affirming the district court's grant of summary judgment to the defendant with regard to the plaintiff's disability discrimination claim but vacating the district court's judgment on the failure to accommodate claim). However, often there is an overlap between a classic disability discrimination claim and a failure to accommodate claim; both claims require the plaintiff to establish she was disabled and that she had the ability to perform essential functions of the job with or without a reasonable accommodation. *Id.* at 104, 107. Where the inquiries diverge is with respect to the final element of each test. In a classic disability discrimination claim, the plaintiff must establish that the defendant "took an adverse employment action against him because of, in whole or in part, his protected disability." *Id.* at 104 (citations omitted). By contrast, a failure to accommodate claim requires that the plaintiff establish only that the defendant knew of her

disability and did not reasonably accommodate it.  *Id*. at 107
(citation omitted).

In *Lara* v. *Unified Sch. Dist. 501*, a case with facts the
Water Works contends "closely mirror" the facts of this case,
Judge Rogers explored whether the plaintiff had exhausted his
administrative remedies with regard to a failure to accommodate
claim under the ADA, ultimately concluding that the plaintiff
had failed to do so.  2008 WL 58870 at *3-8.  Judge Rogers
considered the allegations within the plaintiff's administrative
charge in order to determine whether the failure to accommodate
claim was "like or reasonably related to the claims asserted in
the administrative charge."  *Id.* at *5 (internal quotation marks
omitted).  Noting that the Tenth Circuit had previously found
that "a disability discrimination claim alleging termination
because of an actual or perceived disability does not
automatically exhaust administrative remedies for a failure to
accommodate claim," he concluded that "the claims asserted by
plaintiff in his administrative charge would [not] have provided
reasonable notice to the . . . agency that plaintiff intended to
raise a claim of failure to accommodate."  *Id.*  In further
support of his decision, Judge Rogers referenced the fact that
the agency "investigated only the claims of forced retirement
based upon age and disability" and did not "discuss any findings
concerning failure to accommodate."  *Id.  Lara* is, of course,

not binding authority.  However, even considering it from the perspective of persuasiveness and having in mind the factual distinctions evident in the case, *Lara* does not convince me that Ms. Manning's EEOC Complaint failed to raise a failure to accommodate claim.

In *Lattimore* v. *Polaroid*, 99 F.3d 456 (1st Cir. 1996), another case cited by the Water Works, the First Circuit considered whether the plaintiff had exhausted his administrative remedies with regard to his workplace harassment claim.  The *Lattimore* court found that the plaintiff's administrative complaint did not contain the harassment charge brought by the plaintiff in district court because the harassment charge was "based upon different facts that are separate and distinct both qualitatively and temporally" from those articulated in the administrative charge and related "to the conduct of different individuals."  *Id.*  Specifically, the plaintiff's EEOC Complaint "focused exclusively on his termination and the events leading up to it, all of which occurred after his injury" and contained "no hint of any claim that, before his injury, [plaintiff] was harassed."  *Id.* at 465.  As further evidence of the plaintiff's failure to exhaust his administrative remedies with regard to his harassment claim, the court noted that his original complaint filed in the district

court "also focused entirely on" his termination and "failed to mention any pre-injury harassment." *Id.* at 464.

This case is readily distinguishable from *Lattimore*. Unlike *Lattimore*, Ms. Manning's disability discrimination claims here are not separable from her failure to accommodate claims. They stem from the same alleged disabilities and from the same general events. Because there are no temporal issues, and the conduct at issue is similar, if not exactly the same, I cannot find that Ms. Manning failed to exhaust her administrative remedies. In fact, *Lattimore*, with its discussion of the qualitative and temporal differences between the events in the plaintiff's EEOC complaint and the events later alleged in the district court complaint, supports reading Ms. Manning's EEOC charge liberally and broadly to include a failure to accommodate claim.

In reaching my conclusion that Ms. Manning exhausted her administrative remedies with respect to her failure to accommodate claim, I am further guided by the First Circuit's decision in *Fantini* v. *Salem State Coll.*, 557 F.3d 22 (1st Cir. 2009). In *Fantini* the court examined the district court's ruling that the plaintiff failed to exhaust her administrative remedies with respect to her Title VII claim of gender discrimination. *Id.* at 26. The district court found that the plaintiff's "barely articulated claim, which was not addressed

by either party nor by the administrative agency, [did] not satisfy the exhaustion requirement" because "[i]t defeats the whole purpose of the exhaustion requirement if plaintiff can raise an entirely new discrimination theory in court after testing, and losing on, a different theory in the administrative hearing." *Id.* (citation omitted). The First Circuit was unpersuaded, focusing on the fact that the plaintiff's EEOC complaint had "specifically described an alleged incident of disparate treatment involving her and [a] male employee . . . as well as specifically stat[ing] that she believed her termination, while she was on sick leave, was a pretext for gender discrimination." *Id.* at 27-28. Moreover, the First Circuit considered the way in which the plaintiff's district court complaint was consistent with her EEOC complaint. *Id.* at 28. Because of the description of the incident, and because the plaintiff's district court complaint again described the same incident, the First Circuit concluded that the gender discrimination claim under Title VII was within the scope of the EEOC investigation which could reasonably be expected to grow out of the EEOC complaint. *Id.*

In this case, Ms. Manning checked the "discrimination" and "retaliation" boxes of the EEOC Charge. Significantly, there was no "failure to accommodate" box that she could have checked. Ms. Manning went on to recount that she developed disabilities,

had to leave work, and provided doctors' notes to document her absences and her need for leave because of medical issues. While she was on leave, she was terminated, and she was told that one of the reasons for her termination was "consistent absenteeism." Ms. Manning even notes that the defendant "chose to hold those absences for medical reasons against me" and that prior to the time when her "disabilities began . . . [she] had no issues with absenteeism." In combination, these allegations were sufficient to alert the EEOC of a failure to accommodate claim. That notice is further reflected in the Complaint before me, where Ms. Manning alleges that her heart condition and her "proneness to panic attacks" are disabling conditions and that the defendant "unlawfully discriminated . . . by failing to make . . . reasonable accommodations and in fact terminating . . . [her] employment because of the conditions and circumstances that would have given rise to reasonable accommodation."

Even if a failure to accommodate claim does not as a general proposition automatically flow from a disability discrimination claim, in this case, where the conduct and timing do not differ with regard to either claim under the ADA, and where the elements are so similar, I conclude that Ms. Manning's EEOC Complaint sufficiently put the Water Works on notice of a potential failure to accommodate claim and that any failure to accommodate her disability could reasonably have been expected

to grow from that Complaint. Therefore, construing the EEOC
Complaint liberally to include a failure to accommodate claim, I
decline to grant the Water Works' motion on the basis of Ms.
Manning's failure to exhaust her administrative remedies.

### 2. Failure to Accommodate

The Water Works contends that Ms. Manning's failure to
accommodate claim fails on the merits because she could not
perform the essential functions of her job due to her absences.
The Water Works argues that it accommodated her in granting her
lengthy medical leaves of absence until they were no longer
reasonable, that Ms. Manning never sought any other form of
accommodation, and that even if she had sought the accommodation
to which she now claims she is entitled, it was not a
permissible accommodation under the ADA.

The ADA requires that employers make "reasonable
accommodations to the known physical or mental limitations of an
otherwise qualified individual with a disability who is an . . .
employee, unless [the employer] can demonstrate that the
accommodation would impose an undue hardship on [its] operation
of the business . . . ." 42 U.S.C. § 12112(b)(5)(A). "To
survive summary judgment on a failure-to-accommodate claim, a
plaintiff must prove that: '(1) he [or she] is disabled within
the meaning of the ADA, (2) he [or she] was able to perform the
essential functions of the job with or without a reasonable

accommodation, and (3) [his or her employer], despite knowing of [his or her] disability, did not reasonably accommodate it.'" *Ortiz-Martinez* v. *Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 604 (1st Cir. 2017) (quoting *Rocafort* v. *IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003)) (alterations in original).

It is the plaintiff's burden "to demonstrate in the first instance what specific accommodations she needed and how those accommodations were connected to her ability to work." *Id.* at 605 (citing *Jones* v. *Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012)). That is, the plaintiff must "provide sufficient information to put the employer on notice of the need for accommodation [,] [which] . . . means not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought." *Jones*, 696 F.3d at 89 (citations and internal quotation marks omitted). The plaintiff's requested accommodation must seem "reasonable on its face." *U.S. Airways, Inc.* v. *Barnett*, 535 U.S. 391, 401 (2002) (citations omitted).

Once the plaintiff meets her burden, the employer may defend by showing that the reasonable accommodation sought would cause "undue hardship." *Reed*, 244 F.3d at 258-59. Thus, the plaintiff "bears the burden of proposing an accommodation that would enable [her] to perform the job effectively, and that is feasible for the employer." *Grillasca-Pietri* v. *Portorican Am.*

*Broad. Co., Inc.*, 233 F. Supp. 2d 258, 264 (D.P.R. 2002) (citing *Kvorjak* v. *Maine*, 259 F.3d 48, 55 (1st Cir. 2001)). Only if the plaintiff carries her burden does the defendant need to show "that the proposed accommodation is not as feasible as it appears . . . ." *Id.* (quoting *Reed*, 244 F.3d at 259) (internal quotation marks omitted).

Turning to the second element of the test,[5] the Water Works contends that Ms. Manning could not perform the essential functions of her job as an office clerk because she was absent for 81 of 124 work days over the course of her last six months of employment and was absent for 129 of 249 days during her last 12 months of employment. Ms. Manning fails to respond meaningfully to this argument.

Ms. Manning was an office clerk for the Water Works, a position that involves a variety of tasks and the evidence shows that these duties "require the clerk to be present in the office on a daily basis." Moreover, training and hiring a temporary replacement would have required, at minimum, weeks of on the job training.

To give a sense of the amount of paid leave Ms. Manning requested, and was granted, I will recount in detail her leave

---

[5] The Water Works does not contest for purposes of the motion for summary judgment now before me that Ms. Manning was disabled within the meaning of the ADA.

requests from 2013 through 2014.  Ms. Manning took her first extended medical leave of absence beginning on September 9, 2013, and she remained out of work for one month, until October 8, 2013, after which she returned to the job.  After suffering from stress-induced pain and discomfort in her chest on October 23, 2013, Ms. Manning again took a medical leave of absence. This time, Ms. Manning was out of work from October 23 until November 18, 2013.  Ms. Manning's primary care physician had initially written a note on October 30, 2013 that indicated Ms. Manning would have to be out of work for two weeks.  On November 11, 2013, Ms. Manning's primary care physician prepared a second note that indicated Ms. Manning would be able to return to work without restrictions on November 18, 2013.  Ms. Manning did, in fact, return on November 18, 2013.

Starting March 7, 2014, Ms. Manning again took a medical leave of absence, this time for treatment of depression.  Ms. Manning's psychologist prepared a note for her on March 11, 2014, which indicated that Ms. Manning could not work.  With no clear end date for the leave, Mr. Callahan sent Ms. Manning a letter on April 4, 2014 inquiring as to when she would be returning to work.  Ms. Manning's psychologist wrote back that Ms. Manning would be reevaluated in May for a possible return to work.  Thereafter, on May 8, Ms. Manning's psychologist prepared

a note indicating that Ms. Manning would be able to return to work on May 19.

After returning to work on May 19, Ms. Manning then took another 18 days off from May 21 through August 8.  On August 4, Ms. Manning took a one-week vacation.  Instead of returning to work, however, Ms. Manning's psychologist sent a note on August 7, the day before she was scheduled to return, indicating Ms. Manning would be out seeking treatment for depression and anxiety and would be unable to work.  The note was open-ended, indicating that Ms. Manning would be reevaluated on August 29. It was during this leave of absence, on August 26, that Mr. Callahan sent a letter to Ms. Manning terminating her employment.

Ms. Manning's failure to respond or point to any evidence in support of the proposition that she could, in fact, perform the essential functions of the job (with or without an accommodation) is fatal to her failure to accommodate claim. The uncontroverted evidence shows that Ms. Manning was absent from work for 65% of the last six months of her employment with the Water Works and for 52% of the work days during her last 12 months of employment with the Water Works.  The First Circuit has made clear that "attendance is an essential function of any job." *Rios-Jimenez* v. *Principi*, 520 F.3d 31, 42 (1st Cir. 2008).  Courts hold that this is so even if the reason for the

absences is the disability itself.  *See, e.g.*, *Castro-Medina* v.
*Procter & Gamble Commercial Co.*, 565 F. Supp. 2d 343, 369
(D.P.R. 2008) ("Gross attendance problems can prevent a disabled
person from being qualified for a position even when the
attendance problem is related in whole or in part to the
disability.") (citation omitted).

It is clear from the record that to perform the essential
functions of the office clerk position with the Water Works, the
clerk should be physically present in the office.  Ms. Manning
points to no evidence to show that, without accommodation, she
had the ability to be present in the office for even half the
work days in a given year.[6]  Thus, it is clear that Ms. Manning
could not perform the essential functions of her job without a
reasonable accommodation.

But that is not the end of the inquiry, for if Ms. Manning
could perform the essential functions of her job when given a
reasonable accommodation for her disabilities, then she would
still have a colorable claim.  However, Ms. Manning has failed
to establish that there were reasonable accommodations that
would have allowed her to perform the essential functions of her

---

[6]  As I discuss below, she also points to no evidence indicating
that if granted an accommodation she could have been physically
present in the office.  In fact, the only accommodation she ever
requested was the very medical leave that made it evident that
she could not perform the essential functions of her job.

job or that she even requested the accommodations that she now claims should have been granted to her.  Ms. Manning's four-page opposition brief is unhelpful.  From what I can surmise, she argues that she requested two kinds of accommodation, or at least that she would have done so if she had not had her communication channels blocked.  These accommodations were medical leave and a change in the way she was spoken to and criticized by her supervisors.  Neither of these purported accommodations, however, was reasonable on this record.

First, as to the leave requests, it is unreasonable on its face to take as much time away from work as Ms. Manning did, especially when she requested time off without warning and for open-ended and non-specific amounts of time and when the uncontroverted evidence is that her job duties required her to be in the office.  Ms. Manning has presented no evidence to suggest that her requests for unconstrained medical leave could feasibly be accommodated by the Water Works.  By contrast, the Water Works has presented evidence that supplying a temporary worker to fill Ms. Manning's position would have been quite difficult requiring, at a minimum, weeks of on-the-job training.  As to the second "accommodation," Ms. Manning's argument is unavailing because first, she never made a request that as a form of accommodation her supervisors speak to her differently,

and second, even if she had, that kind of request would on this record be unreasonable as a matter of law.

Ms. Manning argues that there is "an issue of whether or not there were constructive requests" for accommodation. Ms. Manning claims that a letter from her psychologist indicating "that she would be disabled from employment for a finite period of time . . . essentially acted as a request for accommodation of her present condition."[7]

It is unclear whether Ms. Manning intends to assert that she actually requested accommodations aside from medical leave or whether she means to assert that her psychologist's letter was sufficient to put the Water Works on notice of her disabilities such that the Water Works then had a duty to work with her to find a suitable accommodation for her disabilities. To the extent Ms. Manning is arguing the latter, it is true that once a qualified individual with a disability requests the provision of a reasonable accommodation the employer "has an obligation . . . to engage in a meaningful dialogue with the employee to find the best means of accommodating that

---

[7]  Ms. Manning's purported "finite" request for accommodation consists of a letter drafted by her psychologist on August 7, 2014, which states "Teresa A Manning . . . is being treated for depression and anxiety and is currently unable to work. She will be re-evaluated in [sic] 8/29/2014 for ability to return to work." This request is clearly not finite, nor does it suggest a request for any kind of accommodation aside from the problematic leave itself.

disability." *Freadman* v. *Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 104 (1st Cir. 2007) (internal quotation marks and citation omitted).  But that obligation only arises if the request for an accommodation is "sufficiently direct and specific" and the employee "explain[s] how the accommodation is linked to plaintiff's disability." *Id.* at 102.  Here, what kind of accommodation Ms. Manning might have been seeking remains unclear, and Ms. Manning was not sufficiently specific as to what she was looking for.  *See Id.* at 104 (noting that the plaintiff's request to take medical leave was not sufficiently specific with regard to the time period she wanted and finding that the defendant "granted the request it thought had been made" such that the defendant "offered plaintiff a reasonable accommodation").  All that the record shows is that Ms. Manning requested open-ended and continuously recurring medical leave for a variety of medical issues as they arose.  The Water Works accommodated those requests for an extended period and was well within the realm of reason in concluding any more leave would be inconsistent with the essential features of her job.

To the degree Ms. Manning's contention could be read to suggest that she somehow constructively requested accommodations beyond the requests for medical leave in the form of "an adjustment in how the administrative staff addressed her and dealt with issues of possible clerical errors," I find there is

no evidence in the record that she ever made this request or even alluded to anything like it. The failure to articulate any kind of accommodation related to the way in which the staff addressed her or the way in which her errors were dealt with is fatal to the claim that Ms. Manning had requested a reasonable accommodation that the Water Works refused to consider.[8] *See Grillasca-Pietri*, 233 F. Supp. 2d at 264 ("The accommodation requirement does not apply unless triggered by a request from the employee" and "job-related stress and lack of concentration simply do not allow for a finding that [the] employer was on sufficiently direct and specific notice that [the plaintiff] needed a special accommodation") (citations omitted); *Kvorjak*, 259 F.3d at 55 ("[T]he plaintiff bears the burden of proposing an accommodation that would enable him to perform his job effectively and is, at least on the face of things, reasonable") (citations omitted).

Finally, to the extent Ms. Manning means to assert that had she been given the opportunity to speak orally with her supervisors about work, rather than being told to put things in writing, she would have made a different request, *i.e.*, one for

---

[8] Moreover, Ms. Manning's proposed accommodation, which appears to amount to a request that when she made mistakes, she should not be reprimanded for them, is illustrative of the fact that she could not perform the essential functions of her job because she could not deal with conventional workplace stressors necessary for managers to assure quality control.

"an adjustment in how the administrative staff addressed her and dealt with issues of possible clerical errors," demonstrates the futility in her argument. First, Ms. Manning was able to email Mr. Callahan and Ms. Hall. In addition, she had the ability to contact the Board, as evidenced by her call to Mr. Muncey, a member of the Board, to convene a hearing in late 2013. Thus, there was nothing stopping her from initiating contact with her supervisors and telling them about her disabilities and/or her need for accommodations. Second, even if Ms. Manning had initiated such contact on this basis, it would have been "too vague to be considered a request under the ADA . . . ." *Posteraro* v. *RBS Citizens, N.A.*, 159 F. Supp. 3d 277, 290 (D.N.H. 2016) (finding that a plaintiff's request for an accommodation in the form of a "peaceful calm environment" was too vague to be considered a request under the ADA). The proposed accommodation, which essentially amounts to making a busy workplace a stress-free environment, or at least one in which Ms. Manning is shielded from negative feedback, "is an unreasonable accommodation as a matter of law." *See Grillasca-Pietri*, 233 F. Supp. 2d at 264 (citations omitted).

Adopting Ms. Manning's arguments would create perverse incentives. If the Water Works, having initially granted Ms. Manning's leave requests liberally due to her extensive time away from work, were held liable when ultimately it chose to

terminate her employment precisely because of her extended
absences from work, it is unlikely that initial provisional
liberality would be chosen by managers.  The Water Works acted
reasonably, after considerable experience with Ms. Manning's
leave taking practices, in denying Ms. Manning's further leave
requests, and insisting that she be present at work despite
disabling medical conditions.  A specific warning might have
been gentler and in service of a more fully developed program of
progressive discipline, but Ms. Manning points me to no
authority (and I have found none) that indicates a warning was
necessary, or required.  Instead, the Water Works did everything
it could reasonably do to accommodate Ms. Manning's requests for
medical leave, and it only chose to terminate Ms. Manning's
employment after the amount of leave that Ms. Manning was using
demonstrated she was unable or unwilling to return to work
regularly.

    The undisputed evidence in this case is that Ms. Manning's
position required that she be present on a daily basis and that
the Water Works fell behind because Ms. Manning took so much
time away from work.  On the record before me, I cannot find
that Ms. Manning was able to perform the essential functions of
her job, with or without reasonable accommodations for her
disabilities.  Thus, Ms. Manning's claim for failure to
accommodate fails.  *See Jones*, 696 F.3d at 91 ("[A]n employer's

duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [his] job with an accommodation.") (citations and internal quotation marks omitted; alterations in original).

In sum, because Ms. Manning has proffered no evidence suggesting that she could perform the essential functions of her job either with or without reasonable accommodations, and because she has proffered no evidence in support of her claim that accommodations she might somehow be deemed to have requested were reasonable, her claim for failure to accommodate under the ADA fails.

### III. CONCLUSION

For the reasons set forth more fully above, I GRANT the Water Work's Motion for Summary Judgment [Dkt. No. 20].


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE